1  Timothy L. Alger (SBN 160303)
2  tlalger@algerlawapc.com
   ALGER LAW APC
3  100 Spectrum Center Drive, Suite 900
4  Irvine, CA 92618
   Telephone: 949-936-2610
5  Facsimile: 213-559-2427

6  Attorneys for Defendant
7  GREEN LEAF LAB LLC

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  QC LABS, a California corporation       Case No. 8:18-cv-001451-JVS-JDE
    dba CANNALYSIS,
13                                          **GREEN LEAF LAB LLC'S NOTICE**
                                            **OF MOTION AND MOTION TO**
14              Plaintiff,                  **ENFORCE SETTLEMENT**
                                            **AGREEMENT**
15      v.

16                                          **[REDACTED VERSION OF**
    GREEN LEAF LAB LLC, an                  **DOCUMENT PROPOSED TO BE**
17  Oregon limited liability company,       **FILED UNDER SEAL]**

18              Defendant.                  Hearing date: May 18, 2020
19                                          Hearing time: 1:30 p.m.
20
                                            Courtroom 10C
21                                          Hon. James V. Selna
22
                                            Action Filed: August 16, 2018
23                                          Trial Date: None Set
24

25

26

27

28

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 18, 2020, at 1:30 p.m. or as soon thereafter as this matter may be heard, in Courtroom 10C of the United States District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, California 92701, Defendant Green Leaf Lab LLC will, and hereby does, move for an Order Enforcing the Parties' Settlement Agreement.

This Motion is brought on the ground that the Parties entered into a final, complete and enforceable written Settlement Agreement, and Plaintiff QC Labs dba Cannalysis has refused to comply with, and has breached, that Settlement Agreement by ███████████████████████████████████████████ ██████████████████████████. Specifically, Defendant requests that the Court order Plaintiff to fully perform its obligations under the Settlement Agreement, ████████████████████████████████████████████████, award to Defendant its attorneys' fees in the amount of $46,349, and dismiss the Plaintiff's Complaint with prejudice.

On March 13, 2020, counsel for the parties held a pre-filing conference of counsel pursuant to Local Rule 7-3.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, all pleadings and papers on file in this action, those matters of which the Court may take judicial notice, and any such other matters as the Court may consider.


DATED: April 17, 2020                    ALGER LAW APC


                                         By: _/s/ Timothy L. Alger_
                                              Timothy L. Alger

                                         Attorneys for Defendant
                                         GREEN LEAF LAB LLC

-1-

1
2
3

# **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................5

II.  FACTUAL BACKGROUND....................................................................5

   A.  Summary of the Parties' Dispute and Settlement..............................5

   B.  Post-Settlement Proceedings in Court.............................................7

   C.  Detailed Chronology of the Negotiations and Settlement..............10

III. LEGAL STANDARDS.........................................................................20

IV.  ARGUMENT .......................................................................................24

   A.  The Parties Entered into an Enforceable Settlement Agreement ....24

   B.  QC Ratified the Settlement Agreement..........................................26

   C.  QC is Bound by Judicial Estoppel.................................................27

   D.  The Court Should Order QC to Pay Green Leaf's Fees..................28

V.   CONCLUSION ...................................................................................29

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

*Adams v. Johns-Manville Corp.*, 876 F.2d 702 (9th Cir. 1989) ...............................20

*Alvarado Community Hosp. v. Superior Court*, 173 Cal.App.3d 476 (1985) ...........23

*Anand v. Cal. Dept. of Developmental Servs.*, 626 F.Supp.2d 1061 (E.D.Cal. 2009) ....................................................................................................................22

*AT&T Mobility LLC v. Yeager*, 2014 WL 6633374 (E.D.Cal. Nov. 21, 2014).........22

*Bittaker v. Woodford,* 331 F.3d 715 (9th Cir. 2003) ..................................................22

*Blanton v. Womancare, Inc.*, 38 Cal.3d 396 (1985)...................................................22

*Brinton v. Bankers Pension Serv., Inc.*, 76 Cal.App.4th 550 (1999).......................21

*Callen v. Penn. R.R. Co.*, 332 U.S. 625 (1948) ........................................................22

*Callie v. Near*, 829 F.2d 888 (9th Cir. 1987) ...........................................................20

*Chaly-Garcia v. U.S.*, 508 F.3d 1201 (9th Cir. 2007) ..............................................21

*Doi v. Halekulani Corp.*, 276 F.3d 1131 (9th Cir. 2002) .........................................20

*Facebook, Inc. v. ConnectU, Inc.*, 2008 WL 8820476 (N.D.Cal. June 25, 2008) ....................................................................................................................20

*Fidelity & Cas. Co. of N.Y. v. Abraham*, 70 Cal.App.2d 776 (1945).......................22

*Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534 (1996) .......................25

*Gates v. Bank of America*, 120 Cal.App.2d 571 (1953)............................................23

*Guzik Technical Enters., Inc. v. Western Digital Corp.*, 2014 WL 12465441 (N.D.Cal. March 21, 2014) .................................................................................27

*Harrop v. Western Airlines, Inc.,* 550 F.2d 1143 (9th Cir. 1977) ............................21

*Hess v. Hanneman*, 2017 WL 6027015 (S.D.Cal. Dec. 4, 2017) .............................22

*Holt v. MacArthur*, 2014 WL 940327  (S.D.Cal. Mar. 10, 2014) ............................26

*In re City Equities Anaheim, Ltd.*, 22 F.3d 954 (9th Cir. 1994) ...............................20

*In re Clawson*, 434 B.R. 556 (N.D.Cal. 2010) ............................................................22

*In re Hoopai*, 581 F.3d 1090, 1097 (9th Cir. 2009) ..................................................23

*Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100 (C.D.Cal. 2002), *aff'd*, 64
   Fed.Appx. 241 (Fed. Cir. 2003) ...............................................................................23

*Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88 (1992) .........................23

*Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989) .......................................................21

*Lopez v. Charles Schwab & Co.*, 118 Cal.App.4th 1224 (2004)...............................21

*Madani v. County of Santa Clara*, 2019 WL 402362 (N.D.Cal. Jan. 31, 2019) .......21

*Makua v. Panetta*, 2012 WL 2370620 (D. Hawaii Feb. 28, 2012) ...........................20

*Maynard v. City of San Jose*, 37 F.3d 1396 (9th Cir. 1994).....................................20

*Murphy v. Padilla,* 42 Cal.App.4th 707, (1996)........................................................22

*Nellis v. Cushfield Maintenance West Corp.*, 2019 WL 2744835 (N.D.Cal.
   July 1, 2019)..............................................................................................................24

*Newkirk v. Village of Steger*, 536 F.3d 771 (7th Cir. 2008) .....................................26

*NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64 (2000) .............................23

*Osumi v. Sutton*, 151 Cal.App.4th 1355 (2007) .......................................................21

*Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597 (9th Cir. 1996)...........23

*Roden v. Bergen Brunswig Corp.*, 107 Cal.App.4th 620 (2003)...............................21

*TNT Marketing, Inc. v. Agresti*, 796 F.2d 276 (9th Cir. 1986)...........................20, 29

*United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F2d 853 (9th Cir.
   1992) ........................................................................................................................21

*Weddington Prods., Inc v. Flick*, 60 Cal.App.4th 793 (1998)...................................21

## I.     **INTRODUCTION**

The parties settled this trademark infringement lawsuit in September 2019. After Plaintiff insisted to Defendant that the parties had entered into a complete, binding Settlement Agreement, and after Plaintiff's counsel threatened to file a motion enforcing it, Defendant executed the Settlement Agreement and fully performed by assigning its trademarks to Plaintiff.

Plaintiff, under new management, now has buyer's remorse and has refused to perform under the Settlement Agreement.

This dispute is concluded and it is now for both parties to comply with their binding agreement. Accordingly, Defendant asks the Court to enter an Order that Plaintiff fully perform under the Settlement Agreement, ████████████████ ████████████████████████████████, award to Defendant its attorneys' fees in the amount of $46,349, and dismiss Plaintiff's Complaint with prejudice.

## II.     **FACTUAL BACKGROUND**

### A.     **Summary of the Parties' Dispute and Settlement**

This action was filed in August 2018 by Plaintiff QC Labs ("QC"), seeking declaratory relief, damages for trademark infringement and unfair competition, and cancellation of Defendant Green Leaf Lab LLC's ("Green Leaf") registration in California of the trademark CANNALYSIS. QC sued over the California mark in federal court based on diversity after receiving a cease-and-desist letter in June 2018 from Green Leaf.

Green Leaf used CANNALYSIS for its testing and lab consulting business from June 2011 until the settlement of this lawsuit in September 2019. Green Leaf registered the mark CANNALYSIS with the State of Washington on November 2, 2017, for "scientific testing of medical and recreational marijuana." (Reg. No. 60407.) Green Leaf registered the mark CANNALYSIS with the State of Oregon on November 28, 2017, for "laboratory testing" services. (Reg. No. 46927.)

Green Leaf registered the mark CANNALYSIS with the State of California on January 17, 2018, for "consulting and scientific testing of medical and recreational marijuana to provide analytical data for the purposes of compliance with state laws and consumer awareness." (Reg. No. 300242.) Nine days later, QC registered the CANNALYSIS mark in California on January 26, 2018, for "hats, shirts, sweatshirts." (Reg. No. 300452.)

On July 11, 2011, Green Leaf applied to register the mark CANNALYSIS with the U.S. Patent and Trademark Office ("USPTO") for "testing, analysis and evaluation of the goods and services of others for the purpose of certification," but registration was refused because a USPTO examiner concluded from the use of "canna" in the mark that the applicant unlawfully possessed marijuana and the mark would be used in connection with illegal services.[1] Six years later, on June 7, 2017, QC applied to register the mark CANNALYSIS with the USPTO for "hats, shirts, sweatshirts," and the application was granted on August 6, 2019. (Reg. No. 5629412.)

---

[1] The USPTO refuses registration when a trademark application identifies goods falling within the definition of "marijuana" under the Controlled Substances Act ("CSA"). With the passage of the 2018 Farm Bill, which became law on December 20, 2018, "hemp" was removed from the CSA's definition of "marijuana." "Hemp" is defined as "the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 tetrahydrocannabinol [THC] concentration of not more than 0.3 percent on a dry weight basis." Since December 20, 2018, the USPTO has allowed registration of marks for goods derived from "hemp." *See* USPTO Examination Guide 1-19, dated May 2, 2019 (available at https://www.uspto.gov/sites/default/files/documents/Exam%20Guide%201-19.pdf).

As many states have legalized medical and recreational use of cannabis (including products derived from cannabis plants with a THC concentration exceeding 0.3 percent), many licensed cannabis cultivators, processors, distributors and retailers have sought to protect their marks by adding them to state trademark registries. *See* Cal. Sec. of State, "Registering Cannabis-Related Trademarks in California," dated April 29, 2019 (available at https://cannabis.ca.gov/2019/04/29/registering-cannabis-related-trademarks-in-california/). Businesses involved in the cannabis industry have recently obtained trademark registrations from the USPTO where their applications identify a use of the mark in commerce that does not violate federal law. *See, e.g.,* Registration 5758114 by Kiva Brands Inc. (a manufacturer of cannabis confections) for the mark KIVA, for use on an educational medical cannabis website (available at http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4804:8dgzij.2.10).

On January 15, 2019, soon after hemp cultivation became lawful nationwide, Green Leaf applied to register the mark CANNALYSIS with the USPTO for "Scientific testing of industrial hemp and industrial hemp products for the detection of and analysis of cannabinoids, including THC and CBD, as well as pesticides, residual solvents, terpenes, water activity and moisture content." Green Leaf's application was published for opposition on March 3, 2020.

Green Leaf answered QC's complaint in October 2018 and the parties engaged in discovery. As explained in greater detail in Section II(C), counsel for QC and counsel for Green Leaf eventually negotiated a settlement. Throughout six months of discussions, accomplished primarily by email, the settlement terms required ████████████████████████████████████████████████████████ ████████████████████████████████. The focus of negotiations was ███████████████████████████████████████████████████████. Throughout negotiations, counsel made clear to each other that they were consulting with and obtained express approval from their clients of their settlement offers. Agreement on all material terms was reached on September 12, 2019.

A draft Settlement Agreement was prepared by counsel for QC and, after minor revisions agreed to by counsel for both parties on September 20, 2019, a final written agreement was circulated for signatures. A true and correct copy of the Settlement Agreement is attached to the Declaration of Obi Iloptaife ("Iloptaife Dec.") as Exhibit 1.

### B.    Post-Settlement Proceedings in Court

On September 13, 2019, the parties informed the Court they had settled and asked the Court to stay all dates for 30 days so they could "complete the settlement documents and file a joint stipulation of dismissal." [Dkt. 53.] The same day, the Court entered an order dismissing the action "without prejudice to the right, upon good cause being shown within 45 days, to reopen the action if settlement is not

-7-

consummated." [Dkt. 54] This order vacated the fast-approaching deadline for motions for summary judgment and the trial date of December 10, 2019.

A disagreement arose after Green Leaf's managing member learned in the media that QC (which had claimed during negotiations to be cash-strapped) had obtained more than $22 million in new funding. (Declaration of Timothy L. Alger ("Alger Dec.") ¶ 21, Ex. 20.) When Green Leaf's counsel inquired about reopening negotiations, QC's counsel at Rutan & Tucker LLP ("Rutan") sent a letter to Green Leaf's counsel on September 24, 2019 asserting that the parties had entered into a binding agreement and demanding that Green Leaf execute the Settlement Agreement. (Iloptaife Dec. ¶ 15, Ex. 12.) On October 25, 2019, the parties entered into a stipulation asking the Court to re-open the case to allow QC to file a motion to enforce the Settlement Agreement. [Dkt. 59]

The Court reopened the case the same day, and a hearing on QC's planned motion to enforce the settlement agreement was scheduled for December 9, 2019. [Dkt. 60] On November 1, 2019, to avoid QC's threatened motion to enforce, Green Leaf's managing member executed the Settlement Agreement with its attached trademark assignment, and it was delivered to QC's counsel. (Declaration of Paige Pembrook ("Pembrook Dec.") ¶ 5; Declaration of Rowshan Reordan ("Reordan Dec.") ¶¶ 6-9; Iloptaife Dec., Ex. 1.)

On November 12, 2019, the parties submitted a stipulation asking the Court to take off calendar QC's motion to enforce. [Dkt. 61] In that stipulation, the parties informed the Court that Green Leaf signed the Settlement Agreement and "QC Labs anticipates the agreement will be signed [by QC] within one week and anticipates filing a Notice of Dismissal with Prejudice . . . upon compliance with certain terms in the agreement." The Court entered an order taking QC's motion off-calendar and scheduled an OSC re dismissal on December 16, to be held if a dismissal was not filed prior to December 11, 2019. [Dkt. 62]

Meanwhile, on November 11, November 20, and December 9, 2019, Green Leaf's counsel sent emails to QC's counsel inquiring whether QC had signed the Settlement Agreement, without response. (Pembrook Dec. ¶ 6, Ex. 14.) During the same time period, counsel had phone calls during which QC's attorney assured Green Leaf's attorney that QC would sign the Settlement Agreement. (*Id.* ¶ 6.) No copy of the Settlement Agreement executed by QC was delivered to Green Leaf, however. ███████████████████████████████████████████ ████████████████████████████████████ (*Id.* ¶ 7.)[2]

Because QC did not execute the Settlement Agreement, ████████████ ████████ and dismiss the action with prejudice, counsel for the parties appeared before the Court for the OSC on December 16, 2019. (*Id.* ¶ 8, Ex. 15 (hearing transcript).) At the hearing, QC's counsel acknowledged QC's about-face regarding the finality of the Settlement Agreement, and suggested the parties just "dismiss and walk away." (*Id.*) Green Leaf's counsel informed the Court that Green Leaf had signed the Settlement Agreement as a result of QC's announced intention to move to enforce, but that QC's attorneys "informed us recently that they no longer wish to settle." (*Id.*) Green Leaf's counsel informed the Court that Green Leaf now wished to move to enforce the Settlement Agreement, just as QC had threatened to do. (*Id.*) The Court entered an order withdrawing the dismissal and returned the case to the civil active list. [Dkt. 63]

Since the hearing on December 16, 2019, both parties have replaced their counsel. [Dkt. 67, 70] On February 18, 2020, the Court entered an order scheduling a Rule 26(f) Scheduling Conference on March 30, 2020. [Dkt. 66] On March 16 and 23, 2020, counsel for the parties held an early meeting of counsel by telephone pursuant to Rule 26 and submitted a Joint Report on March 24, 2019. [Dkt. 74] The

---

[2] Meanwhile, QC opened a testing lab in Oregon using the name Cannalysis, despite Green Leaf's registration of the CANNALYSIS mark for those services in that state. (Reordan Dec. ¶ 12; Alger Dec. ¶¶ 16-20, Exhs. 17-19.)

1  Court entered an order in chambers on April 2, 2020, staying the action until Green
2  Leaf's Motion to Enforce is heard. [Dkt. 76]

3      On March 13, 2020, counsel for both parties held a pre-filing conference for
4  this Motion pursuant to Local Rule 7-3.

5      **C.**     **Detailed Chronology of the Negotiations and Settlement**

6      In anticipation of QC's probable contention in opposition to this Motion that
7  (1) no binding agreement exists because there was no final meeting of the minds,
8  and/or (2) QC's former counsel at Rutan lacked authority from its client to (a) settle
9  the case, (b) inform the Court that a settlement had been reached, thereby vacating
10  the pretrial deadlines and trial date, (c) assert by letter to Green Leaf that the
11  Settlement Agreement was final and enforceable, causing Green Leaf to sign the
12  agreement, and (d) move to enforce the Settlement Agreement, Green Leaf provides
13  the details of the negotiations and settlement:

14      On November 26, 2018, following a Rule 26(f) Conference, the Court issued
15  the following orders relevant to settlement discussions: (1) the parties were to select
16  a settlement procedure; (2) settlement discussions were to be completed by June 3,
17  2019; (3) the parties were to file another joint report regarding the results of
18  settlement discussions and how the Court could further assist settlement; and
19  (4) all motions were to be filed and served by September 23, 2019. [Dkt. 17, 18]

20      On April 8, 2019, Jayson Sohi of Cotman IP Law Group ("Cotman")
21  (representing Green Leaf) met-and-conferred with Seth Jessee of Rutan
22  (representing QC) regarding discovery. Mr. Sohi then sent Mr. Jessee a confirming
23  email stating, in pertinent part:

24
25  
26
27
28



[redacted]

(Iloputaife Dec. ¶ 6, Ex. 2.)

On April 24, 2019, Mr. Sohi made Green Leaf's initial demand [redacted] (*Id.* ¶¶ 7-8, Exhs. 3 (Jessee email), 4 (Sohi email).) On May 20, 2019, Michael Adams, Rutan's chair of litigation, made QC's counteroffer of: [redacted] (Declaration of Cary Novotny ¶ 4, Ex. 5.) [redacted] (*Id.*) This was not a threat easily dismissed; Rutan and QC were much larger and had far more resources than Cotman and Green Leaf.

On July 24, 2019, Mr. Sohi relayed Green Leaf's counter-demand [redacted] to Mr. Jessee by email:

[redacted]



[redacted]

(Iloputaife Dec. ¶ 9, Ex. 6.[3])

On July 26, 2019, Mr. Adams emailed to Mr. Sohi:

[redacted]

(*Id.* (emphasis added).)

The same day, Mr. Sohi responded with a demand [redacted]. (*Id.*) Mr. Adams responded on August 2, 2019 with the following email:

[redacted]

[3] The email exchanges between counsel between July 24 and August 8, 2019 are all included in Exhibit 6 to the Iloputaife Declaration.



[redacted]

(*Id.* (emphasis added).)

On August 7, 2019, Mr. Sohi made a demand on behalf of Green Leaf [redacted] (*Id.*) Mr. Adams responded the same day by email as follows:

[redacted]

(*Id.* (emphasis added).)

On August 8, 2019, Mr. Sohi relayed Green Leaf's counter-demand:

[redacted]

(*Id.* ¶ 10, Ex. 7.)

On August 8, 2019, Mr. Sohi agreed by email that Green Leaf would pay to Rutan $27,400 in fees relating to QC's successful motion to compel, and reiterated [REDACTED]. (*Id.* ¶ 11, Ex. 8.)

On September 4, 2019, Mr. Iloputaife, a Cotman partner, sent an email to Mr. Jessee stating that he would be getting actively involved in the litigation as it proceeded toward trial. Mr. Iloputaife asked: [REDACTED]

[REDACTED] (*Id.* ¶ 12, Ex. 9.)

On September 5, 2019, Mr. Adams emailed Mr. Iloputaife:

[REDACTED]

(*Id.* ¶ 13, Ex. 10 (emphasis added).[4])

On September 6, 2019, Mr. Iloputaife spoke on the phone with Mr. Adams and then sent the following email:

[REDACTED]

(*Id.*)

---

[4] The email exchanges between counsel between September 5 and September 20, 2019 are all included in Exhibit 10 to the Iloputaife Declaration.

Mr. Adams responded the same day by email:

[redacted]

(*Id.* (emphasis added).)

The email negotiations continued September 9, 2019. Mr. Iloputaife wrote:

[redacted]

(*Id.*)

On September 10, 2019, Mr. Adams conveyed QC's counteroffer of $200,000 by email as follows:

[redacted]

[redacted]

[redacted]

(*Id.* (emphasis added).)

On September 12, 2019, Mr. Iloputaife [redacted]

[redacted]



[redacted]

[redacted]

[redacted]

(*Id.*)

On September 12, 2019, Mr. Jessee of Rutan responded:

[redacted]

[redacted]

(*Id.* (emphasis added).)

Mr. Iloputaife emailed on September 12:

[redacted]

[redacted]

(*Id.*)

On September 13, 2019, Mr. Jessee emailed to Mr. Iloputaife a draft settlement agreement along with a trademark assignment agreement. (*Id.*) The same day, the Cotman firm filed a stipulation on behalf of both parties alerting the Court that the action had settled: "[T]he parties have reached an agreement in principle to settle all matters in controversy between them and are in the process of finalizing and executing a formal settlement agreement. The parties wish to conclude this matter without burdening the Court with any additional appearances and filings, and without incurring unnecessary expenses." [Dkt. 53]

On September 18, Mr. Iloputaife returned the written agreement with some redlined revisions and, on September 20, 2019, Mr. Jessee emailed Mr. Iloputaife as follows:

> Obi,
>
> **We've looked at your changes and comments, which are acceptable. Please send around a final version for execution.**
>
> Thank you.

(*Id.* (emphasis added).)

On September 23, 2019, Mr. Iloputaife emailed Mr. Jessee: "We just hit a snag because of the recent news about Cannalysis Labs obtaining a $22.6M funding. Since this case is about California, is QC Labs amenable to a settlement that only involves California? Let me know so we can propose terms or you can provide QC Labs' terms." (Iloputaife Dec. ¶ 14, Ex. 11.)

On September 24, 2019, Mr. Jessee emailed to Mr. Iloputaife a letter stating that ***"QC Labs and Green Leaf have a valid binding settlement agreement that the***

*court will enforce because (1) the parties reached an agreement on all materials* *[sic] terms; and (2) Green Leaf manifested an intent to be bound by agreeing to* *the terms of settlement and authorizing its counsel to settle the dispute."* (*Id.* ¶ 15, Ex. 12.) Mr. Jessee stated that QC and Green Leaf had agreed to the essential terms of the settlement on September 12, and, "on September 20, 2019, *the parties agreed* *to all terms in a detailed settlement agreement proposed by Green Leaf that QC* *Labs wholly accepted*." (*Id.* (emphasis added.)) Mr. Jessee went on to state that QC would seek its attorneys' fees for bringing a motion to enforce the agreement. (*Id.*) It is important to note here that QC took the position in the September 24 letter that the written Settlement Agreement was final and binding even though neither party (including QC) had signed it.[5]

On October 23, 2019, Mr. Jessee forwarded to Green Leaf's new counsel, Paige Pembrook, a copy of the Settlement Agreement. Mr. Jessee represented to Ms. Pembrook that **"*QC wholly accepted*"** the Settlement Agreement attached to his email. (Pembrook Dec. ¶ 4, Ex. 13 (emphasis added).)

Persuaded by Mr. Jessee's September 24 letter and QC's threat to file a motion enforcing the Settlement Agreement and seek its legal fees, Green Leaf's managing member signed the Settlement Agreement on November 1, 2019. (*Id.* ¶ 5; Reordan Dec. ¶¶ 5-9.) Ms. Pembrook forwarded the signed Settlement Agreement to Mr. Jessee by email the same day. (Pembrook Decl. ¶ 5, Ex. 13.) On November 8, 2019, Mr. Jessee sent to Ms. Pembrook an email suggesting that QC's motion to enforce be taken off calendar "so QC Labs can get its Board of Directors to sign the settlement agreement and we can dismiss the case." (*Id.*)  This was the first time QC's counsel suggested that Green Leaf that QC possibly viewed the settlement as contingent on approval of the QC board of directors. (Iloputife Dec. ¶ 5.)

---

[5] Mr. Jessee took the position that the binding agreement took effect no later than September 20, 2019.  If he is correct, ████████████████████████████████

QC never co-signed the Settlement Agreement, despite its representation to the Court in the stipulation filed November 12, 2019 [Dkt. 61] that it anticipated doing so within a week. (Pembrook Dec. ¶ 7.) The stipulation, prepared by Rutan, stated, in pertinent part:

> WHEREAS, on October 25, 2019, the parties stipulated to reopen the action and the Court ordered that the action be reopened and that QC Labs file a motion to enforce the settlement agreement on or before November 11, 2019;
>
> WHEREAS, Green Leaf has submitted a signed settlement agreement to QC Labs;
>
> WHEREAS, the settlement agreement signed by Green Leaf has been submitted to QC Labs for signature;
>
> WHEREAS, ***QC Labs anticipates the agreement will be signed within one week and anticipates filing a Notice of Dismissal with Prejudice – each side to bear its own costs and fees – upon compliance with certain terms of the agreement*** . . .

[Dkt. 61 (emphasis added).][6]

Ms. Pembrook inquired of Mr. Jessee about QC's signature on the Settlement Agreement by email on November 11 and 20, and on December 9, 2019, but did not receive any response. (*Id.* ¶ 6, Ex. 14.)

### 3.    QC's Breach of the Settlement Agreement

To date QC has not executed the Settlement Agreement or



[6] ████████████████████████████████████████ (*See* Ex. 1, Section 1.8.)

-19-

On March 17, 2020, counsel for Green Leaf sent to QC and its counsel a letter giving notice of default █████████████████████████████████████████ ██████████████████████████████████████████ (Alger Dec. ¶ 16, Ex. 16.) The letter also gave notice to QC and its counsel that Green Leaf, absent cure of the default by QC, intended to resume use and enforcement of its CANNALYSIS mark. (*Id*.)

To date, QC has not cured the breach or responded to the March 17, 2020 default letter. (*Id*.) QC, meanwhile, continues to use the CANNALYSIS mark in its cannabis lab business in California and has begun using it for a cannabis lab in Clackamas, Oregon. (Reordan Dec. ¶ 12; Alger Dec. ¶¶ 17-20, Exhs. 17-20.)

## III.   <u>LEGAL STANDARDS</u>

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987); *In re City Equities Anaheim, Ltd*., 22 F.3d 954, 957 (9th Cir. 1994). A motion to enforce a settlement agreement "essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp*., 876 F.2d 702, 709 (9th Cir. 1989). "Once a settlement has been reached . . . , any party to the agreement may bring an action to enforce it." *Facebook, Inc. v. ConnectU, Inc.*, 2008 WL 8820476, at *2 (N.D.Cal. June 25, 2008) (citing *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1135 (9th Cir. 2002)).

"[T]he court's enforcement powers include the inherent authority to order a party's specific performance of acts required by the settlement agreement and to award damages or other sanctions for noncompliance." *Id*. at 3 (citing *TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986)); *Makua v. Panetta*, 2012 WL 2370620, at *2 (D. Hawaii Feb. 28, 2012) ("A breach or violation of a settlement agreement entitles the non-breaching party to specific performance or an award of unliquidated damages, as appropriate.").

To be enforceable, a settlement agreement must satisfy two requirements. First, it must be a complete agreement. *Maynard v. City of San Jose*, 37 F.3d 1396, 1401 (9th Cir. 1994). Second, both parties or their authorized attorneys must agree to the terms of the settlement. *Harrop v. Western Airlines, Inc.,* 550 F.2d 1143, 1144-45 (9th Cir. 1977) (attorney granted express permission to enter into a settlement agreement on behalf of a party may do so). If material facts concerning the terms or existence of a settlement agreement are in dispute, the parties are entitled to an evidentiary hearing. *Callie*, 829 F.2d at 890.

Enforcement of settlement agreements is governed by the local law which applies to the interpretation of contracts generally. *Chaly-Garcia v. U.S.*, 508 F.3d 1201, 1203 (9th Cir. 2007) (citing *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989)); *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F2d 853, 856 (9th Cir. 1992). To form a contract under California law, the parties must be capable of contracting, there must be a lawful object, the parties consented, and there was sufficient cause or consideration. *Madani v. County of Santa Clara*, 2019 WL 402362, *6 (N.D.Cal. Jan. 31, 2019) (citing *Lopez v. Charles Schwab & Co*., 118 Cal.App.4th 1224, 1230 (2004)).

"California has a strong policy in favor of enforcing settlement agreements." *Facebook*, 2008 WL 8820476, at *4 (citing *Osumi v. Sutton*, 151 Cal.App.4th 1355, 1357 (2007)). A settlement agreement "'must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting.'" *Id.* (quoting *Roden v. Bergen Brunswig Corp.*, 107 Cal.App.4th 620, 625 (2003)). "'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.'" *Madani*, 2019 WL 402362, *6 (quoting *Weddington Prods., Inc v. Flick*, 60 Cal.App.4th 793, 811 (1998)). "When the agreement is in writing, 'the intention . . . is to be ascertained from the writing alone, if possible.'" *Id.* (quoting *Brinton v. Bankers Pension Serv.*, 76 Cal.App.4th 550, 559 (1999)).

-21-

1     Although the circuits are split and the Ninth Circuit has not weighed in on the

2 issue, federal courts in California tend to apply the California rule that an attorney

3 must be expressly authorized by the client to bind the client to a settlement

4 agreement. *In re Clawson*, 434 B.R. 556, 570-71 (N.D.Cal. 2010) (collecting cases);

5 *Hess v. Hanneman*, 2017 WL 6027015, *4-5 (S.D.Cal. Dec. 4, 2017). There is no

6 presumption that an attorney is authorized to settle on a client's behalf "merely by

7 virtue of his [or her] employment as such." *Blanton v. Womancare, Inc.*, 38 Cal.3d

8 396, 404 (1985).

9     If a client alleges its attorney acted without authorization, the question may

10 require an evidentiary hearing. *Anand v. Cal. Dept. of Developmental Servs.*, 626

11 F.Supp.2d 1061, 1067 (E.D.Cal. 2009) (citing *Blanton*, 38 Cal.3d at 403-04)). The

12 party that contends it was not bound by an agreement entered into its attorney bears

13 the burden of demonstrating that its attorney acted without authority. *Id.* at 1067-68

14 (citing *Callen v. Penn. R.R. Co.*, 332 U.S. 625 (1948)); *AT&T Mobility LLC v.

15 Yeager*, 2014 WL 6633374, *5 (E.D.Cal. Nov. 21, 2014). The party also waives

16 attorney-client privilege. *Hess,* 2017 WL 6027015, at *5; *see also Bittaker v.

17 Woodford,* 331 F.3d 715, 719 (9th Cir. 2003) ("[P]arties in litigation may not abuse

18 the [attorney-client] privilege by asserting claims the opposing party cannot

19 adequately dispute unless it has access to the privileged materials.").

20     Several doctrines limit a litigant's ability to disavow a settlement agreement

21 on the grounds that the attorney lacked authority. Attorney-client relationships in

22 California are governed by the general rules of agency. *Fidelity & Cas. Co. of N.Y.

23 v. Abraham*, 70 Cal.App.2d 776, 783 (1945). General agency principles are applied

24 to determine whether a lawyer has been vested by the client with authority to enter

25 into a settlement. *See Blanton,* 38 Cal.3d at 404; *Murphy v. Padilla,* 42 Cal.App.4th

26 707, 716-17 (1996). A client cannot assert that it did not authorize a settlement

27 where the client "obviously kn[ows] that [their lawyer] [i]is negotiating . . . as their

28 representative, and permit[s] that negotiation to go forward with their apparent input

1  and participation." *Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1119 (C.D.Cal.

2  2002), *aff'd*, 64 Fed.Appx. 241 (Fed. Cir. 2003).

3        Moreover, "[a] principal is liable 'when the principal knows the agent holds

4  himself or herself out as clothed with certain authority and remains silent.'"

5  *NORCAL Mutual Ins. Co. v. Newton*, 84 Cal.App.4th 64, 78 (2000) (quoting

6  *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 103 (1992)). If a client

7  takes the position that their attorney had authority to negotiate, but not to finalize, a

8  settlement on their behalf, they had an affirmative obligation, in the context of the

9  parties' negotiations, to advise the adverse party of this fact. *NORCAL*, 84

10  Cal.App.4th at 79 ("A principal's failure to promptly disaffirm an agent's conduct on

11  her behalf constitutes a ratification"); *Gates v. Bank of America*, 120 Cal.App.2d

12  571, 576-77 (1953) ("where the rights of third persons depend on his election, the

13  rule is a principal must disaffirm an unauthorized act of his agent within a

14  reasonable time after acquiring knowledge thereof, else his silence may be deemed

15  ratification or acquiescence in order to protect an unsuspecting third party")). A

16  principal may not both receive the advantages of an agreement and escape its

17  burdens by later repudiation: "[I]t would be unfair to allow him both to have his

18  cake and eat it too." *Alvarado Community Hosp. v. Superior Court*, 173 Cal.App.3d

19  476, 481 (1985).

20        Additionally, the doctrine of judicial estoppel "precludes a party from gaining

21  an advantage by taking one position, and then seeking a second advantage by taking

22  an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d

23  597, 600 (9th Cir. 1996). The doctrine applies when (1) a party's later position is

24  "clearly inconsistent" with its original position, (2) the party has successfully

25  persuaded the court of the earlier position, and (3) allowing the inconsistent position

26  would allow the party to "derive an unfair advantage or impose an unfair detriment

27  on the opposing party." *In re Hoopai*, 581 F.3d 1090, 1097 (9th Cir. 2009). Judicial

28  estoppel is "an equitable doctrine invoked by a court at its discretion to protect

-23-

1  against a litigant playing fast and loose with the courts." *Clawson*, 434 B.R. at 566

2  (citing *Rissetto* and *Hoopai*).

## IV.   ARGUMENT

### A.   The Parties Entered into an Enforceable Settlement Agreement

There can be no dispute that the parties entered into an enforceable agreement settling this lawsuit. Both QC and Green Leaf are companies capable of contracting; an agreement that resolves litigation is lawful; the parties consented to the material terms on September 12, 2019 (as stated in Rutan's September 24 letter) and the parties consented to the final written Settlement Agreement on September 20, 2019; and the agreement is supported by sufficient consideration – ███████████████ ████████████████████████ *See Nellis v. Cushfield Maintenance West Corp.*, 2019 WL 2744835, *5-6 (N.D.Cal. July 1, 2019) (applying the essential elements of a contract to a settlement agreement).

The exchange of emails on September 12, 2019 contained all of the material terms of the parties' agreement, and they were definite, and the written Settlement Agreement approved by both sides on September 20, 2019 comports with that agreement. ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ The agreement was complete.

That an officer or board member at QC has not signed the Settlement Agreement makes no difference. Rutan knew this and asserted that the agreement was binding on September 24, 2019 anyway. Nobody had signed the agreement at that time, but Rutan announced its intention to file a motion to enforce and seek QC's attorneys' fees. Moreover, the Settlement Agreement, which must be interpreted and enforced pursuant to its plain, unambiguous language, does not make the agreement contingent on approval of the QC board of directors. *See*

-24-

1  *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 540-41, 549 (1996)

2  (board approval is a condition precedent to a settlement agreement "only where it

3  can be said that reasonable persons would have understood that the agreement

4  would *not* be effective when originally signed" (original emphasis)). "Conditions

5  precedent are not favored in the law, and courts shall not construe a term of the

6  contract so as to establish a condition precedent absent plain and unambiguous

7  contract language to that effect." *Id.* at 550. The first indication that the QC board of

8  directors would be approving the Settlement Agreement is Mr. Jessee's email to Ms.

9  Pembrook on November 8, 2019, nearly two months after agreement was reached.

10  (Iloputaife Dec. ¶ 5; Pembrook Dec. Ex. 13.)

11     QC also cannot seriously allege (and show a factual dispute) that Rutan

12  lacked authorization to negotiate and enter into the Settlement Agreement. Rutan – a

13  highly respected firm of 150 lawyers – expressly represented throughout its

14  communications with the Cotman firm that its settlement offers were authorized by

15  QC. (Iloputaife Dec. Exhs. 6 (emails of July 26, August 2, and August 7, 2019), 10

16  (emails of September 5, September 6, September 10, and September 12, 2019).) Mr.

17  Adams has practiced law for 24 years and heads Rutan's litigation practice, and Mr.

18  Jessee has practiced law at WilmerHale and Rutan for 11 years. In his September 24

19  letter, Mr. Jessee asserted that the Settlement Agreement was binding because "the

20  parties reached an agreement on all material[] terms" on September 12 and "on

21  September 20, 2019, the parties agreed to all terms in a detailed settlement

22  agreement proposed by Green Leaf *that QC Labs wholly accepted*." (*Id*. Ex. 12.)

23  Mr. Jessee also represented to Ms. Pembrook that the Settlement Agreement that he

24  was forwarding to her one month later, on October 23, 2019, which Ms. Reordan

25  signed, was one that "*QC wholly accepted*." (Pembrook Dec. Ex. 13.)

26     After entering into a binding agreement that it authorized its attorneys to

27  negotiate, finalize and enforce, QC's recent management change does not allow it to

28  now say "never mind" and just "walk away" from the litigation and the binding

-25-

settlement as its counsel advocated the parties do at the December 16, 2019 hearing. "[B]uyer's remorse does not constitute a basis for rescinding a settlement agreement." *Nellis*, 2019 WL 2744835, at \*9 (citing *Newkirk v. Village of Steger*, 536 F.3d 771, 775 (7th Cir. 2008) and *Holt v. MacArthur*, 2014 WL 940327, \*20 (S.D.Cal. Mar. 10, 2014)).

It is beyond dispute that the parties entered into a complete, valid, binding Settlement Agreement, as QC confirmed by letter on September 24 and in its statements to the Court, and that agreement can and should now be enforced by the Court. Given that there is no dispute regarding the existence and validity of the agreement, no evidentiary hearing is required, and the Court should enforce the Settlement Agreement and dismiss the Complaint with prejudice.

### B.  QC Ratified the Settlement Agreement

Even if Rutan did not have authority to enter into the Settlement Agreement on QC's behalf, QC ratified the agreement with its post-acceptance actions (or inaction). QC certainly was aware that the Court had dismissed the action and vacated the case schedule, including a December 10 trial, but it never informed Green Leaf or the Court that Rutan was not authorized to enter into the agreement that caused the Court to take these actions. Instead, its counsel bullied Green Leaf's managing member into signing the written Settlement Agreement and repeatedly assured Green Leaf's lawyers that QC would sign the agreement until December. (Pembrook Dec. ¶¶ 5-7.)

Moreover, QC accepted the benefits of the agreement with a vacated summary judgment deadline and trial date. Rutan did not tell the Court at the December 16, 2019 hearing that it had entered into an invalid agreement because the firm lacked client authorization – obviously because that would have been false and inconsistent with Rutan's prior representations to the Court. Given Rutan's reputation, it is also inconceivable that they would make the deal without client input and approval. *See Madani*, 2019 WL 402362, at \*10 (enforcing settlement

-26-

1  where plaintiff, who contended her lawyer lacked authorization, "remain[ed] silent
2  despite [counsel's] repeated representations to [defendant] and the Court that the
3  parties had settled").

4  **C.     QC is Bound by Judicial Estoppel**

5      Further, QC took a "clearly inconsistent" position that the litigation had
6  settled in its submissions to the Court, and its representations caused the Court to
7  enter orders based on them. QC joined in ***three*** stipulations informing the Court of
8  the settlement, on September 13, 2019 [Dkt. 53], on October 25, 2019 [Dkt. 59], and
9  on November 12, 2009 [Dkt. 61]. These representations alone are sufficient to bind
10 QC. *See, e.g., Guzik Technical Enters., Inc. v. Western Digital Corp.*, 2014 WL
11 12465441, *5 (N.D.Cal. March 21, 2014) (enforcing settlement agreement because
12 counsel for the parties told the Court that they had settled); *Adidas*
13 *Sportschuhfabriken v. Chen*, 1988 WL 1091940, *7 (N.D.Cal. Feb. 2, 1988)
14 (enforcing attachment agreement because of representations of counsel to the court).

15     The first stipulation caused the Court to dismiss the case and vacate the
16 deadline for summary judgment motions and the trial date. In the second stipulation,
17 QC's representation that there was a binding settlement that it intended to enforce
18 by motion caused the Court to reopen the case and convinced Green Leaf's
19 managing member to sign the Settlement Agreement five days later. And in the third
20 stipulation, QC represented, 11 days after Green Leaf had signed the Settlement
21 Agreement, that the agreement would be signed by QC within one week. QC cannot
22 possibly argue that the agreement fell apart because Green Leaf did not immediately
23 sign the Settlement Agreement – it was still representing to the Court on November
24 12, 2019 that QC intended to execute the agreement and file a dismissal with
25 prejudice.

26     Allowing QC to take the opposite position now would endorse a strategy
27 where, by causing Green Leaf to sign the agreement and the Court to vacate the pre-
28 trial and trial schedule, QC obtained the option of enforcing the settlement and

-27-

obtaining its benefits, or simply walking away from it without any obligation to anyone. Not enforcing the Settlement Agreement would give QC an unfair advantage and cause Green Leaf to suffer a detriment. *Hoopai*, 581 F.3d at 1097; *cf. Clawson*, 434 B.R. at 566 (noting that the banks would have been bound by judicial estoppel if their lawyers had represented to the court that the case had settled and the banks had agreed to the terms of the settlement).

### D.   The Court Should Order QC to Pay Green Leaf's Fees

Section 3.3 of the Settlement Agreement provides for an award to the prevailing fees of reasonable attorneys' fees, costs and expenses relating to any court action to enforce or interpret the terms of the agreement. The provision applies here, and, along with the rest of the Settlement Agreement, should be enforced by the Court.

As shown in the Declarations of Timothy L. Alger and Paige Pembrook,[7] Green Leaf has incurred more than $46,349 in fees directly relating to the enforcement and interpretation of the Settlement Agreement. These fees were incurred because Green Leaf first insisted the agreement was binding and then refused to execute and comply with the agreement. Ms. Pembrook's firm was retained to evaluate the Settlement Agreement for its enforceability, including a review of the communications of the parties during settlement negotiations and a review of the controlling law. As a result of QC's assertion that the Settlement Agreement was enforceable, and it intended to move to enforce the agreement, and then chose to disavow the Settlement Agreement, counsel for the parties were required to attend a court hearing on December 16, 2019. That hearing would not have occurred if QC had honored the agreement.  These fees are recoverable.

---

[7] "Declarations of the attorney establishing the number of hours worked and the hourly rate is sufficient to support an award of attorney's fees." *Tiger Bay Village Corp. v. Yihe Corp.*, 2014 WL 3662259, *9 (C.D.Cal. July 18, 2014) (quoting *Paulson v. City of San Diego*, 2007 WL 1756030, *3 (S.D.Cal. June 15, 2007)). However, Green Leaf will be glad to submit all invoices and supporting timesheets to the Court upon request.

-28-

The return of the case to the active civil calendar, counsel's meet-and-confer and joint Rule 26 report, and counsel's meet-and-confer preliminary to the filing of a motion to enforce were also the result of QC's refusal to honor the Settlement Agreement. During both the Rule 26 conference of counsel, and the pre-filing conference of counsel, the attorneys for QC asserted that the Settlement Agreement was not binding and subject to enforcement. In their portions of the Rule 26 report [Dkt. 74], they also asserted that the Settlement Agreement was not binding, and took the position that further negotiations were appropriate (apparently in the hope of obtaining a more favorable conclusion for their client). These assertions by QC's counsel are directly contrary to the representations of QC's counsel to the Court in three stipulations and in communications with Green Leaf in September, October, and November 2019.  Fees incurred by Green Leaf for this work by its lawyers also are recoverable, because they resulted from QC's refusal to comply with the Settlement Agreement.

The preparation of this Motion to Enforce, with supporting declarations and evidence, and a reply are causing Green Leaf to incur more fees, and if a Court hearing is held, the fees will increase further. All of these fees are resulting from QC's refusal to honor the Settlement Agreement, prolonging the litigation and requiring Green Leaf to seek relief from the Court. The total fees incurred by Green Leaf relating to the enforcement and interpretation of the Settlement Agreement exceed $46,349. (Alger Dec. ¶¶ 9-15; Pembrook Dec. ¶ 9.)

## V.   **CONCLUSION**

This Court is empowered to enforce the Settlement Agreement by ordering specific performance. *TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986). It should exercise that power here by ordering QC to ███████████ ███████████████████████████████████ ordering QC to pay Green Leaf's attorneys' fees in the amount of $46,349 within seven days, and dismissing the Complaint with prejudice.

-29-

1

2      DATED: April 17, 2020                    ALGER LAW APC

3
                                                By: _/s/ Timothy L. Alger_
4                                                   Timothy L. Alger

5                                               Attorneys for Defendant
6                                               GREEN LEAF LAB LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28