Timothy L. Alger (SBN 160303)
tlalger@algerlawapc.com
ALGER LAW APC
100 Spectrum Center Drive, Suite 900
Irvine, CA 92618
Telephone: 949-936-2610
Facsimile: 213-559-2427

Attorneys for Defendant
GREEN LEAF LAB LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QC LABS, a California corporation dba CANNALYSIS,<br><br>                        Plaintiff,<br><br>        v.<br><br>GREEN LEAF LAB LLC, an Oregon limited liability company,<br><br>                        Defendant. | Case No. 8:18-cv-001451-JVS-JDE<br><br>**GREEN LEAF LAB LLC'S REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT**<br><br>Hearing date: June 1, 2020<br>Hearing time: 1:30 p.m.<br><br>Courtroom 10C<br>Hon. James V. Selna<br><br>Action Filed: August 16, 2018<br>Trial Date: None Set |

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................4

II.   ARGUMENT ....................................................................................................5

   A.   Plaintiff's Belated Acknowledgment of Settlement ........................................5

   B.   The Settlement Agreement Took Effect, and QC Defaulted,  Long Ago ........6

   C.   Code of Civil Procedure Section 664.6 Does Not Control Here ...................11

   D.   Green Leaf has Prevailed and is Entitled to its Attorneys' Fees...................12

III.   CONCLUSION ............................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*ASP Properties Group, LP v. Fard, Inc.*, 133 Cal.App.4th 1257 (2005) ...................9

*Board of Trustees of the Leland Stanford Junior University v. Agilent Technologies, Inc.*, 2019 WL 4729602 (N.D. Cal. Aug. 13, 2019) ........................7

*Cycle Shack, Inc. v. Harley-Davidson Motor Co.*, 2014 WL 6810081 (Cal. Ct. App. Dec. 3, 2014) ................................................................................................10

*de la Cuesta v. Benham*, 193 Cal.App.4th 1287 (2011) ...........................................13

*Finney v. Ford Motor Co.*, 2018 WL 5879730 (N.D. Cal. Nov. 7, 2018) ...............12

*GoPro, Inc. v. 360Heros, Inc.*, 291 F.Supp.3d 1060 (N.D. Cal. 2017) ......................7

*Graham v. DaimlerChrysler Corp.,* 34 Cal.4th 553 (2004) .....................................13

*Hsu v. Abbara*, 9 Cal.4th 863 (1995) .......................................................................13

*Hubbard v. Phil's BBQ of Point Loma, Inc.*, 2013 WL 3189052 (S.D. Cal. June 21, 2013) ...................................................................................................13

*Dunkelis v. Aronoff*, 2018 WL 2148317 (Cal. Ct. App. May 10, 2018) ....................9

*Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100 (C.D. Cal. 2002), *aff'd*, 64 Fed.Appx. 241 ....................................................................................................12

*Kilpatrick v. Beebe*, 219 Cal.App.3d 1527 (1990) ..................................................11

*Levy v. Superior Court*, 10 Cal.4th 578 (1995) .......................................................11

*Pacific Grove-Asilomar Operating Co. v. County of Monterey*, 43 Cal.App.3d 675 (1974) ..........................................................................................................8

*Patel v. Liebermensch*, 45 Cal. 4th 344 (2008) .........................................................9

*Schaffer v. Litton Loan Servicing, LP*, 2010 WL 9951762 (C.D. Cal. Oct. 18, 2010) ...................................................................................................................12

*Stewart v. Preston Pipeline, Inc.*, 134 Cal.App.4th 1565 (2005) .............................11

**Statutes**

Cal. Civ. Code § 1636 ............................................................................................. 8

Cal. Civ. Code § 1657 ............................................................................................. 7

Cal. Civ. Proc. Code § 664.6 .......................................................................... 11, 12

## I.     **INTRODUCTION**

Plaintiff now concedes that the parties entered into a complete, binding Settlement Agreement, but asks the Court to relieve it of default and its obligation to pay Defendant's attorneys' fees.

Plaintiff's ploy should be rejected by the Court. The Court should order immediate payment of the full settlement amount and award to Defendant its attorneys' fees incurred in enforcing the Settlement Agreement. That Plaintiff has finally executed the written agreement and made a partial payment does not moot the Motion.

Defendant has factually and legally established that the parties entered into a binding contract eight months ago, and Defendant, after obtaining the benefits of that contract, breached (a) by refusing to sign the written Settlement Agreement, and (b) by refusing to make the required settlement payments to Defendant. Defendant has met its burden, and Plaintiff has raised no material dispute, and the Motion should be granted in full.

- Plaintiff does not dispute that its former counsel at Rutan & Tucker was authorized to enter into the Settlement Agreement and bind Plaintiff in September 2019.

- Plaintiff does not dispute that the Settlement Agreement is complete.

- Plaintiff does not dispute that it affirmed the Settlement Agreement after Green Leaf executed the written agreement on November 1, 2019.

- That Plaintiff's president has just now signed the written agreement is immaterial because the Settlement Agreement was entered into and became effective as a matter of law months ago.

- Plaintiff does not dispute that it has received the benefits of the Settlement Agreement for at least seven months. Defendant assigned to Plaintiff the CANNALYSIS mark on November 1, 2019, and Defendant is now using

the mark in Oregon, where only Defendant had the undisputed right to use the mark for laboratory testing services prior to the assignment.

- Plaintiff does not dispute that it did not make the initial payment within seven days of the settlement, or any of the monthly payments since then, thereby disregarding its obligations under the Settlement Agreement.

Plaintiff has long been in default. It has only now acknowledged that it is bound by the Settlement Agreement because Defendant filed this Motion to Enforce. Absent the filing of the motion, and the expenditure by Defendant of significant attorneys' fees, Plaintiff would have continued to refuse performance under the Settlement Agreement while brazenly using the trademark rights it obtained from Defendant pursuant to that agreement.

Defendant asks the Court to enter an Order that Plaintiff fully perform under the Settlement Agreement, including full, immediate payment to Defendant of the entire settlement amount plus interest, award to Defendant its attorneys' fees in the amount of $46,349, and dismiss Plaintiff's Complaint with prejudice.

## II.    ARGUMENT

### A.    Plaintiff's Belated Acknowledgment of Settlement

After insisting since November that the parties had *not* settled, Plaintiff QC Labs ("QC") has now suddenly submitted to the Court a copy of the written Settlement Agreement signed by its president on May 11, 2020, the day its Opposition brief was filed. (Declaration of Tyler Autera ("Autera Dec.") Ex. 2.) QC also wired to the trust account of counsel for Defendant Green Leaf Lab LLC ("Green Leaf") a partial payment of the settlement funds, which was due within seven days of the agreement's effective date or, as discussed below, within a commercially reasonable time after settlement was reached in September 2019. (Autera Dec. ¶ 7; Supplemental Declaration of Timothy L. Alger ("Supp. Alger Dec.") ¶ 13.)

This sudden about-face was motivated by QC's desire to take advantage of an installment payment plan agreed to by the parties in September because QC claimed it was cash-strapped.[1] (Iloputaife Dec. Ex. 10 (Sept. 10 and 12 email exchange).) All payments were accelerated and due long ago because of QC's default. QC also wants to avoid paying the attorneys' fees that were necessitated by QC's refusal to honor an agreement that its president now acknowledges was reached eight months ago. (Autera Dec. ¶¶ 3-4.) By requiring Green Leaf to file and prevail on a motion to enforce, QC became obligated to pay those attorneys' fees.[2]

**B.      The Settlement Agreement Took Effect, and QC Defaulted, Long Ago**

As Mr. Autera admits, the parties settled in September. In its Opposition, QC does not dispute that its former counsel at Rutan & Tucker had the authority to enter into the Settlement Agreement. It is therefore undisputed that the parties entered into a final, complete, binding and enforceable contract on September 12, 2019, when the material terms were agreed to, and certainly no later than September 20, 2019, when counsel for both parties finalized the written agreement and agreed to circulate the document for signing. (Iloputaife Dec. Ex. 12 (Sept. 24, 2019 letter from Rutan attorney Seth Jesse stating that the parties agreed to the essential terms of the settlement on September 12, and, "on September 20, 2019, the parties agreed to all terms in a detailed settlement agreement proposed by Green Leaf that QC Labs wholly accepted").)[3]

_____

[1] This turned out not to be true. (*See* Alger Dec. Ex. 20 (press release and media reports of QC's $22.6 million funding).) Nowhere in QC's Opposition papers does it assert that it is unable to pay the full settlement amount right now.

[2] Mr. Autera's assertion in his declaration that QC did not honor the Settlement Agreement because of a demand by Green Leaf for attorneys' fees (Autera Dec. ¶ 6) is also untrue. In discussions prior to the preparation and filing of the Motion to Enforce, Green Leaf requested full payment by QC of the settlement amount, and urged QC's counsel to make that happen to *avoid* the attorneys' fees that would be incurred if Green Leaf had to proceed with a motion. (Supp. Alger Dec. ¶ 10.)

[3] "QC Labs and Green Leaf have a valid binding settlement agreement that the court will enforce because (1) the parties reached an agreement on all materials [sic] terms; and (2) Green Leaf manifested an

QC's new contention that there was an agreement, but it did not actually take effect and trigger QC's performance obligations until Mr. Autera signed the written agreement on May 11, 2020, falls flat because, as Rutan correctly asserted in its September 24, 2019 letter, the Settlement Agreement *was binding on the parties at that time, without the signatures of any party*.

QC's entire argument that the Settlement Agreement has just now taken effect rests on the notion that the written agreement lacked an "effective date," which the opening paragraph of the written agreement identifies as "the date last set forth in the signature blocks below." In other words, QC is simultaneously acknowledging on one hand that it did indeed enter into a settlement with Green Leaf in September, but that the written agreement was missing a necessary element – an effective date – because it lacked Mr. Autera's signature until May 11, 2020. Immediately after unilaterally picking this "effective date" – many months after its own lawyers at Rutan declared the Settlement Agreement to be binding and enforceable – QC made a partial settlement payment and asserted to the Court that it had not defaulted.

This maneuver does not help QC because: (1) as Rutan stated on September 24, there was agreement on all material terms *prior* to preparation of the writing; (2) Rutan stated on September 24 that the written agreement, after it was finalized by counsel, *was binding without any signatures at all*; and (3) where "the essential terms of a contract are clear, … *the absence of an effective date does not defeat its validity*." *Board of Trustees of the Leland Stanford Junior University v. Agilent Technologies, Inc*., 2019 WL 4729602, *1 (N.D. Cal. Aug. 13, 2019) (emphasis added); *accord GoPro, Inc. v. 360Heros, Inc.*, 291 F.Supp.3d 1060, 1069-70 (N.D. Cal. 2017).

**QC's Refusal to Sign the Written Settlement Agreement**.  Even if we assume for the sake of argument that QC's signature was necessary to create an

---

intent to be bound by agreeing to the terms of settlement and authorizing its counsel to settle the dispute." (*Id.*)

1  "effective date" for the Settlement Agreement, QC was obligated to execute the

2  written agreement and thereby establish that effective date within a "reasonable

3  time." Indeed, QC's signature should have been affixed *immediately*. *See* Cal. Civ.

4  Code § 1657 ("If no time is specified for the performance of an act required to be

5  performed, a reasonable time is allowed. If the act is in its nature capable of being

6  done instantly … it must be performed immediately upon the thing to be done being

7  exactly ascertained.").[4]

8         That QC was aware of its obligation to promply sign the written Settlement

9  Agreement last autumn was confirmed in its contemporaneous statements to Green

10  Leaf and the Court. On November 8, 2019, one week after Green Leaf's managing

11  member, Rowshan Reordan, signed the document, QC's counsel sent to Green

12  Leaf's counsel an email proposing that QC's planned motion to enforce be taken off

13  calendar "*so QC Labs can get its Board of Directors to sign the settlement*

14  *agreement and we can dismiss the case*." (Pembrook Decl. ¶ 5, Ex. 13 (emphasis

15  added).) In a stipulation filed on November 12, 2019 [Dkt. 61], the Court was

16  informed that "Green Leaf has submitted a signed settlement agreement to QC Labs;

17  …the settlement agreement signed by Green Leaf has been submitted to QC Labs

18  for signature; … [and] *QC Labs anticipates the agreement will be signed within*

19  *one week* and anticipates filing a Notice of Dismissal with Prejudice – each side to

20  bear its own costs and fees – upon compliance with certain terms of the agreement

21  …" [Dkt. 61 (emphasis added).]

22         Ms. Reordan's initial hesitation in signing the written agreement did not

23  throw the settlement into doubt, as QC suggests. QC's representations to Green Leaf

24  and the Court that the company would sign the agreement were made *after* Ms.

25  Reordan signed on November 1. QC did not declare after receiving the signed

---

[4] QC is wrong when it argues that the Court should just look at the language of agreement in determining when the agreement became effective. "The plain meaning rule [excluding evidence beyond the words used] was greatly criticized and later repudiated; now evidence of circumstances is admissible to prove a meaning of which the contractual language is 'reasonably susceptible.'" 1 Witkin, Summary of Cal. Law (11th ed. 2019) § 771.

agreement and trademark assignment on November 1 that the deal was off – it did the opposite. The only thing that changed after the November 12 stipulation was management upheaval at QC after the company received $22.6 million in new funding. QC offers no authority for the proposition that it can withhold performance or undo a binding settlement based on the "misgivings" of a new CEO.

It cannot seriously be argued that the parties intended in September 2019 for QC to have the unilateral right to delay signing for eight months, make its initial payment in May 2020, and then spread the installment payments over the following 12 months, to April 2021. Interpretation of a contract, including the effective date, must be determined by the mutual intention of the parties at the time of contracting. *Pacific Grove-Asilomar Operating Co. v. County of Monterey*, 43 Cal.App.3d 675, 686-87 (1974); Cal. Civ. Code § 1636. Conclusive evidence of the parties' intent – that the Settlement Agreement become immediately binding and enforceable – is supplied by Rutan's September 24 letter, written just four days after the written agreement was finalized by counsel. *See* 1 Witkin, Summary of Cal. Law (11th ed. 2019) Contracts § 772 (the parties' actions after contracting may be used to interpret an agreement because "they are probably least likely to be mistaken as to the [parties'] intent."). Moreover, allowing QC to delay signing the agreement (and the required payments) indefinitely without default defies common sense. *See ASP Properties Group, LP v. Fard, Inc.*, 133 Cal.App.4th 1257, 1269 (2005) ("Interpretation of a contract must be fair and reasonable, not leading to absurd conclusions. The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable.").

In any event, signatures of the parties were ***not*** required for the Settlement Agreement to become binding and enforceable in September, as discussed in Green Leaf's moving papers. QC makes no attempt to rebut Green Leaf's evidence and authorities on this issue, and QC does not disavow Rutan's authority to settle the litigation, let alone meet its burden to identify any disputed fact on this point. This

-9-

means QC was obligated to make its initial payment and commence its installment payments for the balance many months ago. "In the absence of a specified time of payment, a reasonable period is allowable under Civil Code section 1657." *Patel v. Liebermensch*, 45 Cal. 4th 344, 352 (2008). Put another way, a reasonable time for payment is implied in every contract that lacks an explicit deadline. *Id*. at 351; *Dunkelis v. Aronoff*, 2018 WL 2148317, *9 (Cal. Ct. App. May 10, 2018) (unpublished) (reversing trial court and enforcing settlement agreement with uncertain payment deadline). A party to an agreement cannot ignore its payment obligations based on a claim that the deadline is unclear.

**QC's Refusal to Pay Green Leaf After the Trademark Assignment.** Even if QC had some uncertainty about the parties' deal because Green Leaf did not immediately execute the written agreement in late September, as QC now suggests in its Opposition, that uncertainty was put to rest when Ms. Reordan signed the agreement at QC's demand and assigned to QC all of Green Leaf's rights to the CANNALYSIS mark on November 1, 2019. At that point, both parties had unequivocally confirmed their intent to be bound by the agreement, and they informed the Court of this on November 12. And QC obtained the benefits of the agreement by receiving and, pursuant to the assignment, using Green Leaf's rights to the trademark, including in Oregon, where Green Leaf held a registration for the mark.[5]

---

[5] QC's assertions about a purported "loss of momentum" and that the agreement "languished" because of the holidays and the COVID-19 crisis (Opp. at 1-2) are red herrings. The parties settled and informed the Court of this prior to the ousting of QC's former CEO in mid-November. QC offers no evidence that Rutan was not fully authorized to make representations and offers on behalf of QC and to settle the litigation in September. A week after Ms. Reordan signed the written agreement, QC's counsel was informing Green Leaf's attorneys and the Court that QC would soon sign the agreement. Green Leaf's requests for a countersigned copy of the agreement were ignored. (Pembrook Dec. Dec. ¶¶ 6-8.) Green Leaf informed QC and the Court in mid-December that it was going to move to enforce the Settlement Agreement. Counsel for Green Leaf informed QC's lawyers in numerous conversations in February and March of Green Leaf's intention to seek its attorneys' fees if a motion was necessary. (Supp. Alger Dec. ¶¶ 9-11.) QC responded by asserting that no enforceable agreement existed, and its attorneys proposed new negotiations. (*Id.*) The pandemic had *no impact whatsoever* on these discussions, QC's refusal to perform under the Settlement Agreement, or the timing or merits of this motion.

1    QC should have begun making payments **by the end of September**, given the

2    position Rutan took (which Green Leaf did not dispute), in its September 24 letter.[6]

3    Or, if we look to Green Leaf's performance (by signing and assigning pursuant to

4    QC's demand) on November 1, the initial payment by QC was due on **November 8**.

5    And, for argument's sake, if there was any ambiguity or gap in the agreement

6    relating to timing because of QC's refusal to sign the document last autumn, a

7    reasonable time for payment is implied, and QC should have made its initial

8    payment by **December 1** (30 days after Ms. Reordan executed the trademark

9    assignment) and commenced making timely monthly installment payments for the

10   balance. *See GoPro*, 291 F.Supp.3d at 1069-70 (enforcing copyright assignment that

11   lacked effective date); *Cycle Shack, Inc. v. Harley-Davidson Motor Co*., 2014 WL

12   6810081, *4 (Cal. Ct. App. Dec. 3, 2014) (unpublished) (enforcing contract lacking

13   effective dates because "[t]he conduct of the parties subsequent to the formation of

14   the contract indicates they intended it to be effective").

15   By not making timely payment of the settlement, QC defaulted and the entire

16   sum became due. QC failed to cure the default, necessitating this Motion to enforce

17   and entitling Green Leaf to an order for full, immediate payment of the settlement

18   plus interest and awarding to Green Leaf its attorneys' fees.

19   **C.    Code of Civil Procedure Section 664.6 Does Not Control Here**

20   QC's contention that the Settlement Agreement is unenforceable because of

21   the requirements of section 664.6 of the California Code of Civil Procedure fails.

22   That provision creates an expedited procedure in state court for entry of a judgment

23   pursuant to a settlement. *Levy v. Superior Court*, 10 Cal.4th 578 (1995).[7]

24

25   [6] QC asserts in its Opposition that making payment due prior to Ms. Reordan's execution of the
     written agreement and trademark assignment "makes no logical sense." This glib remark, of course, is in
26   direct conflict with Rutan's logical and legally supported view on September 24 that the parties already
     were bound by the Settlement Agreement even without signatures.

27   [7] *Levy* teaches us that section 664.6 was enacted as a practical alternative that allows
     litigants to avoid the requirements of summary judgment motion. *Levy*, 10 Cal.4th at 585-86.
28   Here, in contrast, Green Leaf has met summary judgment standards by establishing with
     uncontroverted facts that the parties entered into an enforceable contract under California law that

-11-

In *Levy*, the California Supreme Court made clear that section 664.6's requirement of party signatures for enforcement is limited to a motion brought pursuant to that statute. The state Supreme Court expressly recognized that other, non-statutory judicial enforcement mechanisms remain available. *Id.* at 585-86 n.5 ("[T]his statutory procedure is not the exclusive means to enforce a settlement. Alternative procedures are a motion for summary judgment, a separate suit in equity, or an amendment to the pleadings in this action."). *See also Kilpatrick v. Beebe*, 219 Cal.App.3d 1527, 1529 (1990) ("Nothing in the language of section 664.6 suggests it was intended to be exclusive. Rather, it appears to do nothing more than provide a streamlined method for reducing a stipulated settlement to judgment."); *accord Stewart v. Preston Pipeline, Inc.*, 134 Cal.App.4th 1565, 1584 (2005); *Schaffer v. Litton Loan Servicing, LP*, 2010 WL 9951762, *11-13 & n.58 (C.D. Cal. Oct. 18, 2010); *Inamed Corp. v. Kuzmak*, 275 F.Supp.2d 1100, 1119 (C.D. Cal. 2002), *aff'd*, 64 Fed.Appx. 241 (Fed.Cir. 2003).

The sole case cited by QC on this issue, *Finney v. Ford Motor Co.*, 2018 WL 5879730 (N.D. Cal. Nov. 7, 2018), does not explain whether the plaintiff moved for enforcement solely under section 664.6, and it does not hold that section 664.6 provides the exclusive means of obtaining enforcement of a settlement agreement. Such a decision would be contrary to the holding of the California Supreme Court in *Levy* and the many decisions enforcing settlement agreements made by authorized counsel cited in Green Leaf's Motion to Enforce at pages 20 through 23.

This Court may, and should, enforce the Settlement Agreement that was entered into by the parties through authorized counsel in September 2019.

### D.   <u>Green Leaf has Prevailed and is Entitled to its Attorneys' Fees</u>

The only reason that Mr. Autera signed the written agreement and QC wired to Green Leaf's counsel a partial payment on May 11, 2020 was the Motion to

this Court may enforce through exercise of its equitable powers. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).

-12-

Enforce. Put bluntly, QC is cornered and is trying to snatch anything it can from the jaws of defeat. QC's actions did not moot the Motion because QC continues to refuse to pay the full settlement sum as required by the Settlement Agreement and refuses to pay Green Leaf's attorneys' fees. It was only by incurring those fees that Green Leaf compelled QC to acknowledge that it was bound by and obligated to perform under the Settlement Agreement.

QC suggests that Green Leaf is unreasonable in not simply accepting the initial payment and waiving its entitlement to fees. By the time QC's new counsel, Barry Thompson, and Green Leaf's counsel first spoke on April 24, Green Leaf had already prepared and filed its Motion to Enforce, as it had warned QC's prior counsel it would do in February and March 2020. (Supp. Alger Dec. ¶¶ 9-11.) An award of fees is not a "windfall," as QC asserts. Rather, it is compensation that is required by a Settlement Agreement that QC has now belatedly admits is binding and subject to enforcement.

QC's argument that Green Leaf's attorneys' fees are barred by "unclean hands" or should be reduced because QC also had to pay lawyers lacks any legal authority and is inconsistent with the straightforward fee-shifting provision in the Settlement Agreement. Green Leaf's fees were incurred solely because QC first insisted the agreement was binding and then refused to execute and honor the agreement from mid-November 2019 until mid-May 2020. *See Graham v. DaimlerChrysler Corp.,* 34 Cal.4th 553, 571-72 (2004) (a party "prevails" when it achieves its objectives as a result of litigation, even if the other party claims that its change in conduct was "voluntary"); *Hsu v. Abbara*, 9 Cal.4th 863, 876-77 (1995) (court is required to award attorneys' fees pursuant to contractual fees provision where the party obtained a "simple, unqualified win," as determined by a comparison of the relief sought and the relief obtained); *de la Cuesta v. Benham*, 193 Cal.App.4th 1287, 1295-96 (2011) (abuse of discretion to deny fees to landlord after tenant capitulated and vacated premises on eve of trial); *Hubbard v. Phil's*

-13-

*BBQ of Point Loma, Inc.*, 2013 WL 3189052, *4 (S.D. Cal. June 21, 2013) (citing *de la Cuesta* and awarding fees to plaintiff who enforced consulting agreement).

Here, Green Leaf is the prevailing party, and has moved for and is entitled to its fees under section 3.3 of the Settlement Agreement. QC has not prevailed, and it has never moved to enforce (or for any other relief), and it is not entitled to any award of fees or offset. QC's legal bills are irrelevant.

Further, QC is just plain wrong when it claims that the legal expenses are Green Leaf's fault and should be denied or reduced because "[a]ny review of enforceability Green Leaf undertook was caused by Green Leaf's own actions" and it was Green Leaf's initial hesitation to sign the written agreement that "set in motion" the dispute, making the fees request "not in good faith." In *Hsu*, the California Supreme Court rejected the notion that fees should be denied as a matter of equity based on the victorious party's behavior during the litigation and settlement negotiations.  *Hsu*, 9 Cal.4th at 877. Such an approach "would convert the attorneys fee motion from a relatively uncomplicated evaluation of the parties' comparative litigation success into a formless, limitless attach on the ethics and character of every party who seeks attorney fees under section 1717." (*Id*.)

It was ***QC*** that caused more litigation and expense after the parties settled. The evidence submitted to the Court shows that QC misled Green Leaf in early September when it claimed it was so financially strapped that it needed a year-long payment plan. In reality, QC was at that very moment finalizing $22.6 million in new funding. News of this funding caused Green Leaf to believe it had been lied to, and it reasonably sought the advice of new counsel. After receiving that advice, Green Leaf executed the written agreement and trademark assignment. In contrast, after obtaining what ***it*** wanted (the CANNALYSIS mark), QC refused to execute the written agreement and perform its obligations for more than *six months*, and forced Green Leaf to seek relief from the Court.

Thus, any "forces" that were "set in motion"[8] were the result of *QC's* actions, which, viewed charitably, created suspicion in September that was reasonable and justified. And it was QC that, once it got its way, suddenly changed its tune purely as a matter of business convenience. Even now, in conceding that it is bound by the Settlement Agreement, QC balks at paying the full settlement and the reasonable fees requested by Green Leaf pursuant to the terms of the agreement.[9] Only a Motion to Enforce has compelled QC to begin performing under the Settlement Agreement.

Green Leaf has incurred more than $46,349 in fees directly relating to the enforcement and interpretation of the Settlement Agreement. (Alger Dec. ¶¶ 9-15; Supp. Alger Dec. ¶ 14; Pembrook Dec. ¶ 9.) They should be awarded by the Court.

## III.   <u>CONCLUSION</u>

For the foregoing reasons, and those stated in greater detail in the moving papers, Defendant requests an order from the Court requiring QC to pay the settlement amount in full, plus interest, and Defendant's reasonable attorneys' fees, within seven days, and dismiss the Complaint with prejudice.

DATED: May 11, 2020                              ALGER LAW APC

                                             By: */s/ Timothy L. Alger*
                                                    Timothy L. Alger

                                             Attorneys for Defendant
                                             GREEN LEAF LAB LLC

---

[8] Oppn. at 11:7-8.

[9] QC does not challenge the reasonableness of the fees charged by Green Leaf's current counsel. Work performed by the Ad Astra firm was indispensable to the preparation of the motion to enforce. That QC (far wealthier than Green Leaf) has hired two premier law firms handle this litigation – Rutan & Tucker and Baker & McKenzie – which certainly charge far more than Alger Law and Ad Astra, confirms the serious nature of this litigation and the reasonableness of Green Leaf's request.